UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FOUNTAINHEAD INVESTMENT, INC., ACCESSIBLE
DEVELOPMENT, CORP., ALLAN CARTER, JOHN
D'AVANZO, JASON FOK, TABACALERA, LTD. and
ALTITUDE GROUP, LLC,

                    Plaintiffs,

             -against-

ROBERT DEPALO, VERTICAL CAPITAL PARTNERS,
INC., IGIA, INC., PREM RAMCHANDANI, and AVI
SIVAN,

                    Defendants.

**06 CV 2090**

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
MAR 1 6 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Fountainhead Investments, Inc., Accessible Development, Corp., Allan Carter, John D'Avanzo, Jason Fok, Tabacalera, Ltd., and Altitude Group, LLC, by their undersigned attorneys, Arnold & Porter LLP, for their complaint against defendants Robert DePalo and Vertical Capital Partners, Inc., (the "DePalo Defendants"), and IGIA, Inc. ("IGIA"), Avi Sivan and Prem Ramchandani (the "IGIA Defendants," and collectively, "Defendants"),[1] allege the following based upon investigation of counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings as well as regulatory filings, reports, press releases and other public statement issued by the defendants, and media reports about the defendants.

---

[1]    As set forth in the Related Case Statement, submitted with the Civil Cover Sheet, this action is related to *Hughes Holdings, LLC et al. v. Peter Zachariou et al.*, No. 05-CV-10166 (J. Sprizzo) (the "Hughes Complaint"), which was filed on December 2, 2005. The claims in the Hughes Complaint have been voluntarily dismissed as against all but one of the Plaintiffs here, and that Plaintiff, Fountainhead Investments, Inc., has not been served.

Furthermore, this complaint is based upon plaintiffs' personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

## SUMMARY OF ACTION

1.     This is an action on behalf of plaintiffs to recover damages caused by defendants' fraud and misrepresentations in violation of the federal securities laws,  and breach of contract.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  Many of the acts and practices complained of herein occurred in substantial part in this District.  Additionally, defendants IGIA, Inc., and Vertical Capital Partners, Inc. maintain offices in this District.

5.     In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### The Plaintiffs

6.      Fountainhead Investments, Inc. is a privately-held Delaware corporation with offices at 185 Varick St., New York, New York 10014. Fountainhead Investments currently holds shares of IGIA common stock.

7.      Accessible Development Corporation, is a New York corporation with its principal executive offices located at 1787 McDonald Ave, Brooklyn, NY 11230.      Accessible Development Corporation currently holds shares of IGIA common stock.

8.      Allan Carter is an individual residing at 23414 Torre Circle, Boca Raton, FL 33433. Allan Carter currently holds shares of IGIA common stock.

9.      John D'Avanzo is an individual residing in Pennsylvania.    John D'Avanzo currently holds shares of IGIA common stock.

10.     Jason Fok is an individual residing in New York. Jason Fok currently holds shares of IGIA common stock.

11.     Tabacalera, Ltd., is a limited liability company whose principal executive offices are c/o Linita Bendrihem, Zurbano 73, 5 Int., Madrid Spain.  Tabacalera, Ltd. currently holds shares of IGIA common stock.

12.     Altitude Group, LLC is a New York limited liability company with its executive offices located at 2264 82nd Street, Brooklyn, NY 11214.  Altitude Group currently holds shares of IGIA common stock.

### The DePalo Defendants

13.     Robert DePalo is the Director of Corporate Finance at Vertical Capital Partners, Inc. He resides at 1 Beech Tree Lane, in Glen Head, New York 11545, and maintains his office at 488 Madison Avenue, 8th Floor, New York, New York.

14.     Vertical Capital Partners, Inc., a Delaware corporation, maintains its offices at 488 Madison Avenue, 8th Floor, New York, New York 10022.

**The IGIA Defendants**

15.     Defendant IGIA, Inc. (formerly known as Diva Entertainment, Inc.), is a publicly-held Delaware corporation with its principal executive offices at 521 5th Avenue, 20th Floor, New York, NY 10175.

16.     Defendant Avi Sivan, is the current Chief Executive Officer of IGIA, and is the former CEO of Tactica.  He resides at 3 White Pine Lane, Great Neck, New York 10023.  On information and belief, he maintains an office at 521 5th Avenue, 20th Floor, New York, NY 10175.

17.     Defendant Prem Ramchandani is the current President, Treasurer and Director of IGIA, Inc.  Mr. Ramchandani was formerly an officer of Tactica.  He resides at 111 W 13th Street , New York, New York 10011.  On information and belief, he maintains an office at 521 5th Avenue, 20th Floor, New York, NY 10175.

**Non-Parties to the Complaint**

18.     Tactica International, Inc., a privately-held Nevada corporation in the business of selling and distributing personal care products, is currently in Chapter 11 bankruptcy. Otherwise, Tactica would have been named as a defendant in this lawsuit.  Tactica maintains its office at 521 5th Avenue, 20th Floor, New York, NY 10175.

19.     Hughes Holdings, LLC is a limited liability company organized under the laws of the State of Delaware.

20.     Global Asset Management LLC is a limited liability company under the laws of the State of Delaware.

21.     Allied International Fund, Inc. is a corporation organized under the laws of the State of New York.

### Factual Background

22.     On or about May 16, 2004, Vertical Capital Partners, Inc. ("Vertical"), acting through its Director of Corporate Finance, Robert DePalo ("DePalo"), approached the directors and officers of Diva Entertainment, Inc. ("Diva Entertainment") regarding a possible transaction with Tactica International, Inc. ("Tactica"). DePalo touted Tactica as a company with good growth potential, in need of capital investment and interested in completing a reverse form merger with an appropriate entity.

23.     Negotiations concerning this potential transaction ensued between Tactica, its officers and directors (defendants Sivan and Ramchandani), and the officers and directors of Diva Entertainment. The negotiations primarily occurred with DePalo, who presented himself to Diva Entertainment as a representative of the interests and wishes of Tactica and Sivan and Ramchandani, with the authority to speak for Tactica and Sivan and Ramchandan.

24.     DePalo, acting on behalf of Tactica, repeatedly told Diva Entertainment that unless the proposed transaction moved forward at a very fast pace, the opportunity would be lost and the transaction would fall through. DePalo informed Diva Entertainment that the reason for the rush was that Tactica and its officers and directors were applying pressure to close the deal. In a June 7, 2004 email to counsel for the Diva Defendants and Diva Entertainment, DePalo wrote "... we must close [the deal] by tomorrow ... I'm loosing [sic] traction and there's no reason for it."

25.     DePalo also repeatedly represented to Diva Entertainment that Tactica was in the process of securing at least $7.5 million in financing from Sands Brothers International, Ltd., ("Sands Brothers"), a private investment firm. DePalo, holding himself out as the agent of

Tactica, represented that such financing was certain to come through in the weeks following any deal between Tactica and Diva. This claim concerning the financing proved to be a misrepresentation.

26. On June 11, 2004, the parties entered into a reverse-form merger transaction (the "Transaction") in which Diva Entertainment reorganized under the new name of IGIA, Inc. and acquired all of the issued and outstanding shares of Tactica. Following the deal, IGIA was controlled by the former shareholders of Tactica, and Tactica became a wholly-owned subsidiary of IGIA.

**Central Details of The Transaction**

27. On June 11, 2004, IGIA entered into a Securities Purchase Agreement and Plan of Reorganization (the "Securities Purchase Agreement"), by and among IGIA, Tactica and the Stockholders of Tactica, pursuant to which:

a) Tactica exchanged all of its issued and outstanding shares of common stock for shares of preferred stock and common stock of IGIA as set forth below,
b) The shareholders of Tactica would control the surviving corporation, and
c) Tactica would be a wholly owned subsidiary of IGIA.

28. At the close of the Transaction, and subject to certain post-closing covenants, IGIA issued the following shares to the stockholders of Tactica and certain parties designated by Tactica:

a) 12,400,000 newly-issued shares of its common stock, and
b) 261,000 newly-issued shares of IGIA's newly-designated Series E Redeemable Convertible Preferred Stock, which automatically convert according to the Certificate of Designation with respect thereto into 26,100,000 newly-issued shares of IGIA's common stock upon the stockholder's approval of an amendment to IGIA's Certificate of Incorporation to increase IGIA's authorized common stock from 20,000,000 to 100,000,000 shares.

29.   The following events also occurred in connection with the Transaction:

    a) By action of IGIA's board of directors and the holders of a majority of the IGIA shareholders, IGIA filed a Certificate of Amendment to its Certificate of Incorporation which changed the company's name to IGIA, Inc. and increased the number of IGIA's authorized shares of common stock from 20,000,000 to 100,000,000 shares.

    b) The Board of Directors of IGIA also authorized the filing of a Certificate of Designation with respect to a newly authorized Series E Redeemable Convertible Preferred Stock.

    c) Prior to the Closing of the Transaction, the IGIA Shareholders converted all of their IGIA Series A (other than as indicated below), Series B and Series C Redeemable Convertible Preferred Stock into an aggregate of 2,093,340 shares of IGIA's common stock. These shares were distributed pro-rata to the IGIA preferred shareholders. Following such conversions, the only shares of IGIA's preferred stock which remained outstanding were 100 shares of Series A Redeemable Convertible Preferred Stock which were sold by their holders to certain parties introduced by Vertical for $450,000. Post-closing, the purchasers of the remaining 100 shares of Series A Preferred stock then converted them into 4,600,000 shares of IGIA common stock.

    d) From the IGIA common shares which were outstanding pre-Transaction, after the Closing, 500,000 shares held by Fountainhead Investments remained outstanding together with approximately 70,000 shares in the "Float" which were held by public shareholders.

    e) Prior to the Closing, 1,209,200 shares of IGIA's common stock were tendered by the holders thereof for cancellation.

    f) Prior to the Closing, Peter C. Zachariou, IGIA's President and a director, and David Lean, IGIA's Acting Secretary and a director, resigned from such positions and were replaced by the board and management of Tactica, which included the following Defendants and their positions subsequent to the Closing:

- Avi Sivan        Chairman, CEO & Director
- Prem Ramchandani    President, Treasurer and Director
- Paul Greenfield      Secretary and General Counsel
- Kurt Streams       Assistant Secretary and Chief Financial Officer

30.   As a result of the Transaction, former shareholders of Tactica held approximately 76% of the outstanding voting power of IGIA. The holdings of IGIA stock at the Closing were as follows:

| Common | |
| --- | --- |
| Float | 69,800 |
| Prior Fountainhead Holdings | 500,000 |
| Conversion of Fountainhead Series B Preferred Shares | 1,150,000 |
| Other Former Preferred Shareholders | 843,340 |
| Tactica Shareholders (newly-issued) | 12,460,000 |
| ▮▮▮ | ▮▮,▮▮▮,▮▮▮ |
| Preferred | |
| Series A Preferred Shares | 100* |
| Series E Preferred Shares | 261,000** |
| * Converted after the Closing to 4,600,000 shares of freely-trading common stock **Convertible into 26,100,000 shares of restricted common stock upon approval of increase in authorized common shares to 100,000,000 | |

31.     The 100 shares of Series A Preferred stock were sold to Hughes Holdings, LLC, Global Asset Management, and to Gary Schonwald, all non-parties to this Complaint but plaintiffs in the Hughes Complaint, pursuant to a Stock Purchase Agreement dated June 11, 2004. Those parties were identified and introduced by the DePalo Defendants. Following the conversion to common shares, those purchasers issued the common shares to the following individuals and entities:

- Steel Harbor Holdings LLC
- The Catalyst Group LLC
- Strategic Partners Consulting LLC
- Geoffry Eiten
- Michael Morris
- Gary Schonwald

- Ronald Heineman
- Joseph Catania
- Khosrow Voassoughi
- John Glabman
- Global Asset Management
- Hughes Holdings LLC
- Allied International
- Stewart Taylor
- William Taylor
- Robert DePalo
- Anthony DePalo
- Jason Pappas
- Daniel Pappas
- Rafaella Scala
- Robert Yakov

The Stock Purchase Agreement included a representation that the Purchasers were buying for

"investment purposes and not with a view to distribution." The Purchasers further agreed to

indemnify the Sellers for any breach of warranty, including that representation.

32.     The Purchasers of the 100 shares of Series A Preferred stock are parties who are

closely associated with DePalo. For example, DePalo himself acquired 10,000 of the common

shares resulting from the conversion of the 100 shares of Series A Preferred stock, and he signed

the Stock Purchase Agreement on behalf of Hughes Holdings, LLC, which acquired 980,000

shares of the common stock following the conversion. The President and sole owner of Global

Asset Management, which also acquired 980,000 shares of the common stock following the

conversion, is Robert Fallah, the co-chairman of Vertical Capital Partners, Inc.

33.     During the pre-transaction negotiations, the Plaintiffs expressed the fear that

these Series A Preferred Purchasers, including the DePalo Defendants, would "dump" the shares

immediately following the transaction. Vertical, acting through DePalo, repeatedly assured the

attorney for the Plaintiffs and Diva Entertainment that he knew the purchasers, and they would

not sell the shares right away, or take any other actions to dilute the value of the IGIA stock.

This proved to be a material misrepresentation.

34.    Vertical further represented to the attorney for the Plaintiffs and Diva

Entertainment that the 100 Series A shares were being sold to these third party purchasers with

the full knowledge of Tactica.

## The Anti-Dilution Clause

35.    The Securities Purchase Agreement included a clause intended to protect against

dilution of the IGIA shares in existence following the Transaction:

> **3.2 Restriction on Future Share Issuance:**
> The parties hereto agree that for a period of at least one year
> following the Effective Time, the Surviving Corporation shall issue
> no new shares of any class other than (a) shares issued in
> connection with a bona-fide acquisition of another company; (b)
> shares issued in connection with a financing of at least $7,500,000
> with the Surviving Corporation's shares being priced at no less
> than the greater of $1.00 or 75% of the closing bid price of the
> Surviving Corporation's Common Shares on the closing date of
> such financing or (c) an underwritten public offering of the
> Surviving Corporation's Common Shares at a price greater than
> $1.00 per share.

## The No Material Adverse Change Clause

36.    The Securities Purchase Agreement also included the following clause:

> **4.8    No Material Adverse Change:**
> Since the date of the Financial Statements, there has not occurred a
> Material Adverse Effect and no event has occurred or circumstance
> exists that may result in a Material Adverse Effect.

## Post-Transaction Events

37.    Upon information and belief, following the June 11, 2004 Transaction, the new

IGIA board of directors approved the conversion of the 100 Series A Preferred Shares into

4,600,000 shares of IGIA common stock. As a result of this conversion, the group of purchasers associated with DePalo (the "DePalo group"), including the DePalo Defendants, owned by far the largest block of freely-trading shares. The combined total of the freely-trading common shares owned by holders other than the DePalo group was only 1,013,140.

38.     In contrast, 40,763,000 outstanding common shares were restricted from trading immediately following the Transaction. Fountainhead Investments owned a total of 1,650,000 restricted shares following the Transaction.

39.     According to stock trading data, nearly 6 million shares of IGIA stock were traded between June 18, 2004 and October 31, 2004 -- approximately 1.5 million in the first six weeks alone after the deal closed. The only group with enough free-trading shares to move that volume so quickly was the purchasers of the Series A Preferred Shares.

40.     At least as an indirect result of the high level of selling, the share price dropped from $2.50 per share immediately following the Closing to its current level of approximately $.02 per share. Such a precipitous drop in share price caused the Plaintiffs significant and material losses in the value of its holdings of restricted shares.

41.     In order to facilitate this scheme and in an attempt to support the price of the stock artificially, the IGIA Defendants issued false and misleading press releases, provided interviews to investor relations firms and investment analysts, and made filings with the SEC related to the performance of IGIA's business. Specifically, on July 21, 2004, IGIA issued a press release through PR Newswire wherein Avi Sivan, IGIA's CEO stated:

> We are extremely pleased to report profitability in the first quarter,
> which represents our significant progress in streamlining

> operations.  We remain focused on expanding our globally
> recognized portfolio of brands and lines of consumer products.
>
> . . .
>
> [a]s a newly publicly-traded company through the merger of
> IGIA, Inc. and Tactica, we now operate from a platform poised for
> growth.  We expect our trend of strong revenues and earnings to
> continue in the coming quarters.

This press release was issued only 40 days before the end of IGIA's second quarter ending

August 31, 2004.  No additional disclosures were made to in any way modifying this optimistic

outlook until October 17, 2004 -- the date the company was required to file its Form 10-QSB

Quarterly Report for the period ending August 31, 2004 with the U.S. Securities and Exchange

Commission.

42.     At the same time, DePalo, when asked by certain Plaintiffs about the decline of

IGIA's stock price, assured those Plaintiffs who had freely-trading IGIA shares that IGIA's

performance was on track and implored them to hold their shares because the share price would

recover.  In purported support of these representations, DePalo even assured certain Plaintiffs

that he had "buyers" for their IGIA shares at specified prices if they would continue to hold their

shares back from the market.  These Plaintiffs held their stock in reliance on DePalo's

representations.  No such "buyers" ever materialized and these Plaintiffs were materially

damaged as the shares price continued to fall.

43.     On August 2, 2004, IGIA issued another press release entitled "Igia, Inc. States

Terms of Private Placement Equity Financing," detailing a purported financing which it

indicated was in process.  This press release was as optimistic about IGIA's operations as earlier

public statements:

The Company is continuing with its core business, which is cash
flow positive with internal growth and had revenues of $6.6
million for the first quarter ending May 31, 2004. **The Company
does not need additional funding to maintain its core business.
The Company is raising capital to finance the introduction and
development of new product lines.** (emphasis added).

On information and belief, the IGIA Defendants and the DePalo Defendants knew these

representations to be false and misleading at the time, and intentionally failed to disclose IGIA's

precarious financial position.

44.     On August 26, 2004, IGIA issued another press release through PR Newswire

wherein it "…announced that its relationship with Sands Brothers International, Ltd., which has

acted as Financial Advisor for IGIA has expired and that IGIA has decided not to extend the

relationship, and effective immediately Sands will no longer have any involvement or authority

to offer securities, debt or act on behalf of the Company in any capacity." In making this release,

IGIA failed to disclose the reasons behind the termination of Sands Brothers, or that the failure

to complete the minimum $7,500,000 financing by Sands Brothers, which had been a

fundamental condition of the Plaintiffs' involvement in the Transaction, would have a

devastating financial impact on the company.

45.     It appears that during August 2004, IGIA, through its investor relations firm,

National Financial Communications Corp., gave an interview to a newsletter, "Richard Geist's

Strategic Investing, An Independent Guide to Profitable Opportunities." The September 2004

issue of the newsletter featured IGIA as its "Highlighted Stock." The multi-page article included

several quotes from IGIA management, including:

- "…[IGIA] has stated that it does not need additional
  funding to maintain its core business. With the stock below

$1.00, we expect that the financing is on hold, but we expect the present business to continue to grow."

- "While the revenue trend appears to be down, there have been a number of events to suggest that IGIA is now well positioned to leverage its international brand equity into new product lines and seek out licensing agreements to enhance their top and bottom lines."

- "...we expect revenues to grow as the second half of the year tends to be the company's strongest period."

- "By adjusting its operations and development to the level of capitalization, management believes it has sufficient capital resources to meet projected cash flow deficits through the first quarter of fiscal 2006."

- "...we believe this high risk investment has a good chance of returning profits to early and long focused investors who can tolerate high volatility.

On information and belief, each of these statements was known to the DePalo Defendants and the IGIA Defendants to be false or misleading when made.

46.     On information and belief, the DePalo Defendants and the IGIA Defendants knew as early as May 2004 that the operations and financial position of IGIA were trending negatively, but they consistently failed to disclose this information to the Plaintiffs.

47.     On October 17, 2004, IGIA filed a Form 12b-25 Notification of Late Filing with the Securities Exchange Commission with respect to its inability to file its Form 10QSB for the period ended August 21, 2004.  The Form 12b-25 included the following disclosure:

IGIA, through our wholly-owned subsidiary Tactical International, Inc., a Nevada corporation ("Tactica"), sells a variety of personal care and other products to retailers and directly to consumers. Tactica uses television and print media advertising extensively to promote sales in both segments.  Our total revenues for the six-month period ended August 31, 2004 were approximately $10 million as compared to $25 million for the same period ended

257751_1.DOC                                    -14-

> August 31, 2003. The decrease is primarily the result of a decrease
> in media advertising spending, which has a positive correlation to
> our revenues. In addition, under the terms of a April 29, 2004
> agreement, we transferred all our rights to the Epil-Stop® brand to
> Helen of Troy and they granted us a three-year license to sell Epil-
> Stop products to our customers outside of North America, Central
> America, South America and the Caribbean."

48.     The October 17, 2004 Form 12b-25 indicates that revenues were down

significantly for the period of March-August, 2003. But during the negotiations in advance of

the Transaction, neither the DePalo Defendants or the IGIA Defendants provided any indication

to Diva Entertainment or any of the Plaintiffs, either directly or through their attorneys, that

revenues would be down at all, much less by approximately 60%. Such a rapid decline in

revenues indicates that the downturn likely began prior to the closing of the Transaction. Since

Sivan and Ramchandani had access to Tactica's internal corporate documents, they knew or

should have known of the existence of this "material adverse event" under clause 4.8 of the

Securities Purchase Agreement. Such an omission clearly involves a material fact which should

have informed the Plaintiffs' decision of whether to proceed with the Transaction.

49.     The Securities Purchase Agreement contains a clause requiring Tactica to deliver

to Diva Entertainment true, correct and complete copies of various financial statements no later

than two days prior to Closing. This clause includes the following provision:

> The Company [Tactica] represents and warrants that the Company
> Financial Statements . . . (ii) fully reflect all liabilities and
> contingent liabilities of the Company required to be reflected
> therein on such basis as at the date(s) thereof, . . . (iv) no adverse
> change in the financial position of the Company as reflected in the
> Company Financial Statements that could result in any Material
> Adverse Effect shall have occurred prior to the Effective Date and,
> as of the Effective Date, the Company has no knowledge of any
> future or threatened event which could have a Material Adverse
> Effect on the financial position of the Company as reflected in the
> Company Financial Statements.

(emphasis added).

50.     On October 21, 2004, Tactica filed a Form 8-K with the Securities Exchange

Commission, announcing its filing of a voluntary petition for relief under chapter 11 of title 11 of

the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

Southern District of New York.  The Form 8-K provides the following explanation:

> In the ordinary course of Tactica's business, Innotrac warehouses
> Tactica's products, processes orders and inventory and ships these
> products to Tactica's customers.  Tactica asserts that the value of
> its inventory held at Innotrac's facility is approximately $9 million.
> Innotrac informed Tactica that Innotrac would not permit Tactica
> to remove its inventory stored with Innotrac unless Tactica paid
> Innotrac all amounts allegedly due.  Despite numerous attempts to
> obtain financing prior to its filing for bankruptcy protection,
> Tactica was unable to do so.  As a result of the foregoing factors,
> Tactica did not have a sufficient available source of working
> capital to continue its normal operation of business.  Tactica and
> Innotrac attempted, without success, to reach an out of court
> agreement to resolve the terms of payment to Innotrac.

**The Breach of Contract**

51.     The Securities Purchase Agreement contains a clause as protection against

dilution of the shares (see ¶ 35 above).  On March 23, 2005 IGIA filed a Form 8-K with the

Securities Exchange Commission announcing that it had authorized for issuance 50,000 shares of

Series G Preferred Stock with a par value of $.001 per share and a stated value of $0.03.  The 8-K

also announced that IGIA issued 25,000 shares of Series G Preferred Stock to both Sivan and

Ramchandani in further violation of the anti-dilution clause.

52.     On April 20, 2005 IGIA filed a Form 8-K with the Securities Exchange

Commission announcing that on March 23, 2005 it had entered into an agreement with certain

investors for the sale of $3 million in callable secured convertible notes and stock purchase

warrants to buy 6,000,000 shares of IGIA common stock. The conversion price for the notes is described as the lower of $0.04 or 50% of the average of the three lowest intraday trading prices for IGIA common stock during the 20 days before, but not including, the conversion date. These terms are a clear violation of the anti-dilution clause included in the Securities Purchase Agreement between Tactica and Diva Entertainment.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder Against the DePalo Defendants and the IGIA Defendants

53.     The Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

54.     During the relevant time period, the DePalo Defendants and the IGIA Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the Plaintiffs as alleged herein; and (ii) cause the Plaintiffs to enter into a corporate reorganization and exchange of securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the DePalo Defendants and the IGIA Defendants took the actions set forth herein.

55.     The DePalo Defendants and the IGIA Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of IGIA securities in an effort to maintain artificially high market prices for IGIA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All the

DePalo Defendants and the IGIA Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.    The DePalo Defendants and the IGIA Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Tactica and IGIA as specified herein.

57.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Tactica's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Tactica and its business operations and future prospects in the light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs.

58.    By virtue of the foregoing, the DePalo Defendants and the IGIA Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.    As a direct and proximate result of these defendants' wrongful conduct, the Plaintiffs have suffered damages in connection with their purchases and sales of IGIA/Diva securities.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act Against**
**Robert DePalo, Avi Sivan, and Prem Ramchandani**

60.     The Plaintiffs  repeat and reallege each and every allegation contained above as if
fully set forth herein.

61.     Robert DePalo acted as a controlling person of Vertical within the meaning of
Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position and his
ownership and contractual rights, participation in and/or awareness of the material false
statements and omissions provided to the Plaintiffs as part of the negotiations regarding the
Transaction, DePalo had the power to influence and control, and did influence and control,
directly or indirectly, the decision-making of Vertical, including the content and dissemination of
the various statements which the Plaintiffs contend were false and misleading.  DePalo was
provided with or had the ability to prevent the issuance of the statements or cause the statements
to be corrected.

62.     Avi Sivan and Prem Ramchandani acted as controlling persons of Tactica and
IGIA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of
their high-level positions, and their ownership and contractual rights, participation in and/or
awareness of the false statements provided to the Plaintiffs as part of the negotiations regarding
the Transaction, Sivan and Ramchandani had the power to influence and control, and did
influence and control, directly or indirectly, the decision-making of Tactica and IGIA, including
the content and dissemination of the various statements which the Plaintiffs contend are false and
misleading.  Sivan and Ramchandani were provided with or had unlimited access to copies of
Tactica and IGIA's reports, press releases, public filings and other statements alleged by the

Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.    Robert DePalo had direct and supervisory involvement in the day-to-day operations of Vertical and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.    In addition, Sivan and Ramchandani, as executive directors of Tactica prior to the Transaction and of IGIA after the Transaction, had direct and supervisory involvement in the day-to-day operations of Tactica and IGIA, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.    Further, Sivan and Ramchandani acted as controlling persons of DePalo and Vertical within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their participation in and/or awareness of the false statements provided to the Plaintiffs as part of the negotiations regarding the Transaction, Sivan and Ramchandani had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of DePalo and Vertical, including the content and dissemination of the various statements which the Plaintiffs contend are false and misleading. Sivan and Ramchandani were provided with or had unlimited access to statements alleged by the Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Furthermore, Sivan and Ramchandani communicated with

the Plaintiffs through DePalo and Vertical, and relied upon DePalo and Vertical to represent their interests in the underlying Transaction.

66.     As set forth above, IGIA, Vertical and DePalo each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, DePalo, Sivan, and Ramchandani are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate cause of defendants' wrongful conduct, the Plaintiffs suffered damages in connection with their purchases and sales of IGIA/Diva securities.

## THIRD CLAIM

### Common Law Fraud Against the DePalo Defendants and the IGIA Defendants

67.     The Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

68.     During the relevant time period, the DePalo Defendants and the IGIA Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the Plaintiffs as alleged herein; (ii) cause the Plaintiffs to enter into a corporate reorganization and exchange of securities at artificially inflated prices; and (iii) cause the Plaintiffs to hold essentially valueless securities that, but for the DePalo Defendants' and the IGIA Defendants' wrongful conduct, would have had value.  In furtherance of this unlawful scheme, plan and course of conduct, the DePalo Defendants and the IGIA Defendants, took the actions set forth herein.

69.     The DePalo Defendants and the IGIA Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon the purchasers of IGIA securities.

70.     The DePalo Defendants and the IGIA Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Tactica and IGIA as specified herein.

71.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Tactica's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Tactica and its business operations and future prospects in the light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs.

72.     As a direct and proximate result of these defendants' wrongful conduct, the Plaintiffs have suffered damages in connection with their purchases, sales and holdings of IGIA/Diva securities.

## FOURTH CLAIM

### Breach of Contract Against Individual Defendants Avi Sivan
### and Prem Ramchandani

73.     The Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

74.     Prior to the Transaction, the Plaintiffs were controlling shareholders of Diva Entertainment.  Diva Entertainment entered into an express contract with Tactica in the June 11, 2004 Securities Purchase Agreement.

75.     Sivan and Ramchandani breached the terms of the Securities Purchase Agreement by issuing, in April 2005, convertible obligations in exchange for financing at rates in violation of the anti-dilution clause of the Securities Purchase Agreement, of which the Plaintiffs were third-party beneficiaries.

76.     As set forth above, the Plaintiffs have suffered damages as a direct and proximate result of the breach of the Securities Purchase Agreement by Sivan and Ramchandani.

## JURY TRIAL DEMANDED

The Plaintiffs hereby demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as follows:

A.      Awarding the Plaintiffs damages and statutory compensation against each
        defendant, jointly and severally, and in favor of the Plaintiffs in an amount in
        excess of $2,300,000.00, plus pre-judgment interest thereon;

B.     Disgorgement of any profits realized by Vertical, DePalo and those parties

affiliated with DePalo;

C.     Awarding the Plaintiffs the costs and expenses of this litigation;

D.     Awarding the Plaintiffs punitive damages;

E.     Awarding the Plaintiffs such other and further relief as this honorable Court may

deem just and proper.

Dated: New York, New York
       March 16, 2006

Respectfully submitted,

**ARNOLD & PORTER LLP**

By:_____
Veronica E. Rendon (VR 6534)
Daniel M. Kuhn
399 Park Avenue
New York, New York  10022-4690
(212) 715-1000

*Counsel for Plaintiffs*